ANNA BAKER, OLIVE BAKER, EMMA BAKER GRAHAM, STELLA UPTE-GROVE, RACHEL SPEARS, DAVID AUSBIN STUART, HELEN BURGER DOWLING ZANZRI, MARY HENDERSON, E. C. BAKER, HELEN V. JONES, MAL E. PORTER, GERTRUDE C. SPALDING, SUSIE BAKER MATHIESEN, WALTER STEVENS, MARY STEVENS MORRIE, MARY STEVENS MORRIE, Guardian of the Person and Estate of WILLIAM STONE STEVENS, n. c. m., and FLORA BAKER MENEFEE, Appellants, v. EVERETT B. SPEARS, BERNADINE STUART JONES, LORENE STUART, DOROTHY STUART HIXSON, LUCILLE SPEARS MEYERS, PAUL MEYERS, MILDRED MENEFEE, WILLIAM ROBERT JONES, REVEREND WILLIAM G. BENSBERG, SAMUEL BAKER, BENJ. HOLLIS, VIRGINIA JONES CLINE, The Executive Officers of MONTGOMERY CITY, Missouri, CHAPTER OF THE DAUGHTERS OF THE AMERICAN REVOLUTION, MONTGOMERY CITY CEMETERY ASSOCIATION, THE CHRISTIAN CHURCH of Montgomery City, Missouri, CLARA GEARY, LILLIAN AUSTIN, ROBERT AUSTIN, MARGARET HIGBEE, LOUISE GIRAUD, MARY DUVALL, HAROLD DUVALL, SANDRASUE DRESKER, HERMAN DRES-KER, R. L. CHISHOLM, Two Sons of R. L. CHISHOLM, LIZZIE ROGERS, A. C. KING, LAURA M. WALKER, GENEVIEVE WOOLSEY, LENA BELLE NEWKIRK, JOHN CLAY, MARIE GIBSON, CLARA BAKER; COUNCIL OF CLUBS, GIRLS HOTEL, CITY UNION MISSION of Kansas City, Missouri, Board of Curators of the UNIVERSITY OF MISSOURI, SALVATION ARMY of Kansas City, Missouri, CHILDREN'S MERCY HOSPITAL of Kansas City, Missouri, JAMES E. GIBSON, S. CLAY BAKER, JAMES E. GIBSON, S. CLAY BAKER, Executors of the Alleged Last Will and Testament of EMMA S. GANSON, Deceased, J. R. HOOVER, J. H. CLAY and DAVE MORRIS, Constituting the BOARD OF TRUSTEES of the Memorial Christian Church and the MEMORIAL CHRISTIAN CHURCH, 72nd Street and the Paseo, Kansas City, Missouri, RAPHAEL MILLER, JR., and CLARA SPALDING.— No. 40100.—210 S. W. (2d) 13.

Division One, March 8, 1948.

Rehearing Denied, April 12, 1948.

*A. H. Juergensmeyer, Glover E. Dowell* and *N. Murry Edwards* for appellants.

*W. B. Brewster* for the Children's Mercy Hospital, *Ruby D. Garrett* for Salvation Army of Kansas City, *Orrin B. Evans* for Board of Curators, University of Missouri, *Dick H. Woods, Albert W. Thomson, Paul R. Stinson* and *S. S. Nowlin* for Memorial Christian Church, J. R. Hoover, J. H. Clay and Dave Morris, Trustees of Memorial Christian Church, James E. Gibson, S. Clay Baker, and James E. Gibson and S. Clay Baker, Executors, and others, respondents.

606

VAN OSDOL, C.—Action to contest the will of Emma S. Ganson, deceased. By her will dated April 28, 1942, testatrix disposed of property of the appraised value of $228,978.80. The estate [15] was comprised of many stocks, bonds and mortgages of great diversity of investment, some tangible personal property and cash, and real property in Jackson County, Missouri, and in Latimer County, Oklahoma.

Testatrix was born July 13, 1856, and died November 22, 1944, being then in her eighty-ninth year. Her husband had died in the year 1900. No lineal descendant survived testatrix. A son, John Stevens Ganson, born in 1879, had died in. 1919.

Contestants-appellants are collateral kindred—cousins and descendants of deceased cousins of testatrix. Proponents-respondents are numerous beneficiaries of general and specific legacies including persons (relatives, friends, and ministers of the gospel) and named organizations (religious, patriotic, educational, and charitable); trustees and executors named in the will; and Memorial Christian Church of Kansas City, the residuary legatee and beneficiary of the major portion of testatrix' estate.

Contestants alleged testamentary incapacity and undue influence, but the trial court refused to submit the issue of undue influence to the jury. Upon the submitted issue of testamentary capacity, the jury returned a verdict upholding the will.

Appellants (contestants) assign errors of the trial court, (1) in refusing to submit the issue of undue influence; (2) in giving an instruction withdrawing the issue of undue influence; (3) in the admission of evidence; and (4) in the giving and refusal of instructions on the submitted issue of testamentary capacity.

(1) Testatrix for many years prior to 1934 had lived in Kansas City. In that year she went to Montgomery City and made her permanent home with her cousin, Stella Uptegrove, a widow, a beneficiary in the will, and a contestant-appellant herein. In some years thereafter testatrix visited Kansas City two or three months of the year, but she "didn't go back much in (the last) ten years." Testatrix was a member of the Christian denomination. In later years it seems she was a member of the Christian Church at Montgomery City, although she was an (only) honorary member of the Memorial Christian Church of Kansas City. She had been in part helpful in erecting the building of Memorial Christian Church, the construction of which building was completed in 1936. She had pledged $25,000 to that Church, $10,000 of which pledge was paid by her in her lifetime. The cornerstone of the Church building bears the legend, "In Memory Of My Mother Margaret M. Stevens And My Son Stevens-Ganson 1936 E. S. G." and the stone lintel over the front windows of the building carries the lettering, "Stevens-Ganson Memorial Christian Church."

Testatrix had executed five wills—one, March 27, 1929; one, June 3, 1939; one, "early in May" 1940; one, December 9, 1941; and the one in contest, dated as stated April 28, 1942. In all these paper writings she gave a major portion of her property to charitable or religious use. In paragraphs almost identical, Item V, in the 1939, 1941, 1942 wills and, we infer, in the will of 1940, testatrix made provision for the payment of any balance of her $25,000 pledge unpaid at her death. This provision and the benefaction of the residuary clause to Memorial Christian Church were contained in the wills of 1939, 1940, 1941, 1942.

In 1929, testatrix was possessed of an estate of about $50,000 derived from the estates of her deceased mother and son. John Stevens Ganson, son of testatrix, had been the good friend of James E. Gibson, now in the investment business at Kansas City. In the year 1928, Gibson had become and continued to be testatrix' agent and business adviser. He received a nearly maternal affection she bestowed upon him after the death of her son. She sometimes referred to him as "my boy" and referred to herself as his "second mother." He was given $1000 in the will of 1929 and, in subsequent wills, $1000 and one or two shares of the capital stock of the First National Bank of Kansas City said to be worth $400 a share. Gibson was named executor and trustee in the will of 1929, and executor and trustee jointly with S. Clay Baker in the wills of 1939, 1940 and 1942. S. Clay Baker, a civil engineer, was a second cousin of testatrix; and handled some of her business, particularly her income tax affairs. In the 1929 will Robert Baker, now deceased, father of S. Clay Baker, was bequeathed $1000 In [16] the will of 1939, S. Clay Baker was given $1000, and in the subsequent wills he was given $1000 and two shares of bank stock "as evidence of my appreciation of the interest he has shown in me and in my affairs."

It is conceded by respondents that Gibson and Baker stood in fiduciary relation to testatrix. But the only direct evidence of any activity of Gibson in the execution of any will is his testimony that, in the spring of 1929 preceding the execution of the will in March, testatrix told him she wanted to execute a will and he immediately took her to the office of his "close friend," Roy B. Thomson, Esquire, a member of the Jackson County Bar, introduced her to Thomson, "and left her there." Gibson "never saw the original of that 1929 will." He "knew of" the 1939 will in which the gifts to the Church are first seen and which will also was prepared by Thomson. Gibson had not known of any subsequent wills until he received the will in contest, which was mailed to him by Baker in May 1942

As stated, Gibson and S. Clay Baker were trustees and executors of the wills made after that of 1929 (except they were not named executors in the will of 1941). Baker wrote the will of 1940; and the evidence shows he was active in causing the execution of the (1942) will in contest, the circumstances of the making of which are now stated.

In 1941, being without the State in war production work, S. Clay Baker requested Oscar A. Kamp, Esquire, of the Montgomery County Bar, to attend to testatrix' income tax matters. During her conferences with Kamp, testatrix asked him to rewrite her will, and a new will was made December 9th. Testatrix made no change in her benefactions to the Church; but Kamp, and others than Gibson and Baker were named executors—this was because of a misapprehension—it seems that testatrix thought Gibson and Baker were no longer resi-

dents of Missouri. In April 1942, Baker came to Montgomery City and learned from Kamp of the new (1941) will. Testatrix, having been advised by Baker of the change in executors, expressed surprise and the (1942) will in contest was executed, which will comprises the first six pages of the Kamp (1941) will and two pages typewritten by Baker which were like the last two pages of the Kamp (1941) will, except that Gibson and Baker were again named executors.

It is contended by appellants that the evidence of fiduciary relation of Gibson and Baker to testatrix, of her benefactions to them and of their activities in the execution of the will(s) is sufficient in requiring the submission of the issue of undue influence to the jury. Appellants do not rely solely upon that evidence, however. They contend there was also substantial evidence that ministers of Memorial Christian Church, particularly Dr. James H. Tilsley and Dr. Millard L. Riley, and certain trustees of that Church unduly influenced testatrix to execute her will making the Church the major beneficiary.

Dr. Tilsley had become minister of Memorial Christian Church October 1935, and "continued through almost all the month of October, 1941." He then went to the pastorate at Wichita, Kansas. When first introduced to testatrix, he was told "Mrs. Ganson was the lady who had put twenty-five thousand dollars in her will for the new church building." He testified he had "discussed Mrs. Ganson's will with her quite a bit . . . probably ten times." The greater number of these conversations were between 1935 and 1939, and prior to the date of the 1939 will; on a number of occasions "during the visit," he gave her "spiritual advice." The minister saw her at the Church on Easter Sunday, 1941. He visited her in her home at Montgomery City in May and in October 1941, and did not see her thereafter. Sometime before June 1939, she showed him a copy of the will of 1939. She asked him to make a copy of the section that dealt with the Church. She said "she was definitely afraid that her relatives would attempt to break her will." She told him of "her intentions"—that an educational building should be built, and a parsonage rent fee to the minister; "and that if financially possible the piece of ground to the east would be purchased for youth recreation, and that there would be enough money to guarantee the maintenance of the physical buildings." Dr. Tilsley was given $1000 in the will of 1939—[17] the bequest was not in the wills of 1941 and 1942.

Dr. Riley succeeded Dr. Tilsley as pastor. Dr. Riley testified he first saw testatrix February 28, 1942, at her home in Montgomery City. He was accompanied there by Joseph R. Hoover, a trustee of Memorial Christian Church, and was introduced by Hoover to testatrix as the "new minister." She asked about a number of people of the Church, inquired of the Church attendance and of the Church debt, and spoke of the "beautiful location" of the Church building.

He visited her again August 11, 1942; February 23, 1943; in February 1944; and July 28, 1944.

J. H. Clay, a trustee of the Church, testified he had become acquainted with testatrix in 1933, and saw her frequently during her residence in Kansas City. She had twice visited in his home, once in 1938, and once in the spring of 1939. She "talked about" the Church site, and "about the hopes she had for the future of the church. She told me . . . the twenty-five thousand dollars she was contributing . . . was in honor of her son and her mother. 'Now, Mr. Clay,' she said, 'I want to put up a building in my own memory. That's why I'm leaving the residue of my estate to the church.' " On Sunday morning in 1939, "she came to me after church and said, 'Mr. Clay, here is my will I just made. I want you to take it home and read it so you will be able to identify it. That is the way I want my money to go.' "

The jury found for respondents on the issue of testamentary capacity and, infra, we have held there was no error in the trial of that issue; however, we consider the evidence bearing upon her physical and mental condition may be useful on the question of the submissibility of the issue of undue influence.

Contestants introduced evidence tending to show testatrix was afflicted with senile dementia, and there was testimony of the eccentricities of manner and behavior said to be those of one so afflicted. Her condition grew gradually worse. The eccentricities were stated by one witness to have been observed so early as 1930. She suffered a broken hip in 1939. She was not so active thereafter. In 1943, about fourteen months after the execution of the will in contest, she was adjudged of unsound mind in a probate court proceeding. Because of a defect in the service of notice of the hearing, another inquiry was had in 1944, and testatrix was (again) adjudged of unsound mind. Gibson was appointed guardian. The testimony was not all one way, however. Proponents' witnesses testified of testatrix' strong will and sound mentality; a physician's testimony negatived senile dementia, and letters written by testatrix to Gibson were indicatory of a reasonably close attention to her investments. Her failings in her last years, according to proponents' witnesses, were but those usual of one so old and were not seen to be of incapacitating effect until 1943 and 1944.

"By undue influence is meant such influence as amounts to force, coercion, or over-persuasion which destroys the free agency and will power of the testator." Sehr v. Lindemann, 153 Mo. 276, 54 S. W. 537. Undue influence may be shown indirectly and arise as a natural inference from other facts in the case. It must not rest on mere opportunity to influence, or on mere suspicion. Walter v. Alt, 348 Mo. 53, 152 S. W. 2d 135. The shown facts of fiduciary relation and a benefaction to or in the interest of the fiduciary are in-

sufficient, in themselves, as bases for the inference of undue influence. In order to afford substantial foundation for such inference there must be evidence not only of the fiduciary relation and benefaction, but also that the fiduciary-beneficiary was "active in some way which caused or assisted in causing the execution of the will." Loehr v. Starke, 332 Mo 131, 56 S. W. 2d 772; Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. 2d 400; Clark v. Powell, 351 Mo 1121, 175 S. W. 2d 842; Buckner v. Tuggle, 356 Mo. 718, 203 S. W. 2d 449. Such activity on the part of the fiduciary-beneficiary may be inferred from facts and circumstances in evidence. Loehr v. Starke, supra; Clark v. Powell, supra; Buckner v. Tuggle, supra. But the additional inference of activity and the resulting inference of undue influence may not rest on conjecture but must be based upon evidence, circumstantial or otherwise, [18] from which the necessary inferences may be fairly drawn. Buckner v. Tuggle, supra.

There was direct evidence the ministers and trustees of the Church knew of and talked with testatrix about her will of 1939. There was no direct evidence they suggested the execution of the will, nor was there direct evidence they influenced her to the end of causing her to make the will's benefactions. Rather does the direct evidence negative any exercise of influence. Ignoring the direct evidence negativing influence, an ultimate fact of undue influence, if it be permissible, must be founded upon the circumstance of benefaction to the Church and upon the circumstances that a spiritual adviser, Dr. Tilsley (and the trustees), upon several occasions talked with testatrix about her will. In this connection, we are referring to the 1939 will. From the circumstances of the conversations concerning the will of 1939 and the subsequent visits of the ministers and trustees with testatrix, we are urged to sanction a permissible inference that she was unduly influenced into making the will of 1942.

It has been observed that one's mind may become habituated to the influence of another, and yield to that influence and suffer it to have its effect, although the person in the habit of its exercise may not be present or exert it at the time the act is done (Taylor v. Wilburn, 20 Mo. 306). And it is unnecessary to show overt acts of undue influence at the very time the will is made (State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S. W. 2d 360). Nevertheless, to invalidate the will the undue influence "must have been present, in active exercise, and sufficient to destroy the free agency of the testator at the time of the making of the will, so that the will is not 'in fact his own will, but that of the party who was exercising the undue influence.'" Beckmann v. Beckmann, 331 Mo. 133, 52 S. W. 2d 818; State ex rel. Smith v. Hughes, supra.

There is no showing the minister primarily charged with the exercise of undue influence was in any way active in causing the making of the will in contest. The evidence shows he had removed to Wichita

even prior to the making of the will of 1941. There is no evidence Dr. Riley, who came to the Church in early 1942 after the execution of the 1941 will, ever discussed with testatrix, or knew of the execution of the will of 1942 prior to its execution. There is no evidence the trustees ever knew of the execution of the contested will until after its execution. There is no showing a will was discussed with testatrix during the several visits at Montgomery City. Nevertheless, the provisions, Item V and the residuary clause of the 1942 will, were like those of all wills, except that of 1929. The testatrix was old and, it seems, had the failings of one of her advanced age, but she resided in the home of her dear friend and relative, Stella Uptegrove. In that home she was near many other friends and relatives who frequently visited her. Her home was miles away from the residences of those charged with the exercise of undue influence upon her, and with whom she had no contacts except by letter and through the several visits we have mentioned. In the circumstances, we regard an inference of undue influence vitiating the 1942 will to be conjectural and forced, and consequently not permissible. We believe the evidence urged as supporting the inference relating to the will of 1939 and the shown circumstances obtaining thereafter are not substantial in justifying the inference of an influence destroying the free agency of testatrix in making the will of 1942.

That which has been said of the insufficiency of the evidence to sustain the alleged undue influence of the pastors and trustees of the Church may also be said with emphasis concerning contestants' charge of undue influence by Gibson. (There is no evidence of any concert of plan or of action between Gibson and Baker, nor is there any showing that either of them was in any way connected with the Church or planned or acted in concert with the Church or its ministers or trustees in the making of any will.)

There was no detriment to appellants, or additional benefit or advantage to Baker *as a legatee* brought about by his activity in the execution of the will in contest. The only effect in testamentary action, [19] which could be said to have been caused by his activity, was his and Gibson's reinstatement as executors. In other respects the will of 1942 was like that of 1941. One of the bases for the permissible inference of undue influence is *benefaction*—''some pecuniary benefit to be derived directly or indirectly under the will'' by the fiduciary by whose activity the testator is influenced to make the will. Barkley v. Barkley Cemetery Ass'n., 153 Mo. 300, 54 S. W. 482. There should be shown *benefaction,* fiduciary relation and activity. In our case, Baker's bequest was the same as in the 1941 will; and it is seen from the evidence that he, as an heir-at-law, would receive a distributive share of the estate (if there were *no* will) in an amount substantially greater than the amount and value of $1000 and bank stock bequeathed to him. In these particular cir-

cumstances, we are of the opinion he was not a *beneficiary*-fiduciary whose activity would give rise to a permissible inference of undue influence. Baker, it is true, was designated testamentary trustee in all of testatrix' wills after that of 1929; and by the will of 1942 he was "reinstated" as executor, others having been designated executors in the will of 1941. The mere designation of Baker, a fiduciary, as executor and trustee could not be said to give the fiduciary Baker an advantage or benefit which would not have been reaped by a stranger if a stranger had been so designated by testatrix. Shelton v. McHaney, 338 Mo. 749, 92 S. W. 2d 173; Ryan v. Rutledge, Mo. Sup., 187 S. W. 877.

(2) The given Instruction D-2 told the jury there "is no evidence in this case of any undue influence practiced upon Mrs. Ganson in the execution of the instrument dated April 28, 1942, and you cannot find against the will upon that ground." Our examination of the transcript of appellants' opening statement and of questions appellants propounded to witnesses makes clear to us the jury must have understood appellants were contending the will was the result of undue influence. We see no prejudicial error or abuse of discretion in giving the instruction. The trial court (having correctly decided the issue of undue influence had not been substantiated) was confronted with the question whether the jury in arriving at their verdict might be misled into the consideration of a false issue, undue influence. See Shelton v. McHaney, supra; Vol. 1, Raymond, Missouri Instructions to Juries, sec. 157, pp. 166-7. The instruction did not erroneously withdraw facts or charges of specific facts which facts could have competently affected the submitted issue of testamentary capacity, and appellants' counsel were yet privileged in their argument to urge upon the jury the probative effect of all of the evidence introduced pertinent to the submitted issue of testamentary capacity. The instruction differs from that held erroneous in the case of Schulz v. Smercina, 318 Mo. 486, 1 S. W. 2d 113, and in other cases cited by appellants. The instruction in the Smercina case withdrew the charge of negligence in failing "to keep a lookout laterally." This was misleading and prejudicial because the average jury would conclude they should ignore defendant's duty and the evidence of his failure to look to the sides of the streets or to "look laterally," which evidence was competent on the submitted issue of humanitarian negligence.

(3) In the will, Stella Uptegrove was made the beneficiary for life of a trust estate of $5000 and five shares of bank stock, and the will directed cancellation of her note of $2500 payable to testatrix. A point was made that the benefaction to her was unjust and unnatural, when considered in a relation to the value of the estate and to the shown great and kindly services she had rendered testatrix. We think there was no error in admitting into evidence a

claim of $8500 for board, room, and nursing filed by Stella Uptegrove against the estate. Such a claim contemplates an obligation of the estate, and tends to explain the asserted unnatural provision. Similarly, the claim of Spears and wife for like services to testatrix was admissible for like purpose. Mrs. Spears was a relative, a beneficiary in the will, a contestant herein, and a witness for contestants.

We believe it was not error to admit into evidence copies of certain letters of a witness-contestant-appellant; and of that contestant's husband, also a witness. [20] The letters were suggestive to a recipient that she (a relative of testatrix and now a contestant-appellant) should join in the action to contest the will. A witness, S. Clay Baker, testified the original letters had been returned to the recipient. Proponents' counsel requested the original letters from contestants, whose counsel disclaimed all knowledge of the letters. On cross-examination the witnesses minimized their concern in the outcome of the action and, being confronted with copies of their letters, denied or equivocated as to authorship. The letters were competent in tending to refute the witnesses' stated lack of concern in the outcome of the action. Upon their denial or equivocation as to authorship, and upon the proponents' demand for the production of the original letters and respondents' disclaimer, the copies verified by the testimony of Baker were admissible. See generally Vol. 5, Jones, Commentaries on Evidence, 2d Ed., secs. 2353-4, p. 4611 et seq.; and Vol. 6, Jones, supra, secs. 2438-9, p. 4825 et seq.

(4) In Instruction D-8, the trial court told the jury,

". . . the testimony as to the mental condition of Emma S. Ganson prior to and subsequent to the date of the signing of the paper writing offered in evidence was admitted only for the purpose of throwing light upon her mental condition at the time of the execution of the said paper writing.

"And even though you may believe that at times, both prior and subsequent to the making of the will, Emma S. Ganson did not have sufficient capacity to make a will within the meaning of these instructions, yet if you believe *that at the time she signed the said paper writing,* to-wit, April 28, 1942, she had such capacity, as defined in other instructions, your verdict should be for the defendants." (Our italics.)

As seen supra, there was evidence introduced by appellants tending to show that prior to the making of the will testatrix had senile dementia (which disease, physicians testified, is incurable and progressive). Appellants say that because of this evidence the presumption or inference was permissible that testatrix was of unsound mind when the will was made. It is contended there was no evidence tending to show a lucid interval and the instruction was erroneous in depriving appellants of the benefit of the inference. But, as stated,

there was evidence introduced negativing senile dementia and tending to show that testatrix was of sound mind until months after making the will. In instructing the jury, it was not improper to give the jury assistance in applying the evidence; the instruction did not preclude urging an inference (of incapacity at the time the will was executed) founded upon the evidence tending to show senile dementia; and we rule the contention adversely to appellants. Schultz v. Schultz, 316 Mo. 728, 293 S. W. 105. Of course, the will could not be found invalid on the charge of testamentary incapacity without evidence, direct or inferential, of such incapacity *at the time* the will was executed. Smith v. Fitzjohn, 354 Mo. 137, 188 S. W. 2d 832.

The trial court instructed the jury, D-11,
"To render Mrs. Ganson competent to make a will, the law does not require the same degree of understanding or mental capacity necessary to make a contract or manage her estate, nor any particular degree of understanding; but she must have sufficient understanding or intelligence at the time of making or executing her will to comprehend the nature and extent of the transaction she is, at the time, engaging in, to know her relatives and the natural objects of her bounty, the nature and extent of her property and to whom she desired to and was giving it; and if you find from the evidence that Emma S. Ganson possessed these requisites at the time she signed the instrument here in evidence as her purported will, you must find for the will."

Appellants say the first clause singles out "making a contract and managing her estate." They say the evidence shows testatrix had not been able to manage her estate for years and the instruction deprives appellants of the effect of such evidence. But the instruction has the support of judicial decision. Meyers v. Drake, 324 Mo. 612, 24 S. W. 2d 116; Buchholz v. Cunningham, 340 Mo. 302, 100 S. W. 2d 446. [21] It is the law that testamentary capacity is not dependent upon a capacity to make a contract or manage an estate, but upon capacity as the jury were, in material substance, instructed in the Instruction D-11. Meyers v. Drake, supra; Walter v. Alt, supra; Pulitzer v. Chapman, supra. It was not error to fail to include the requirement that testatrix "understood the ordinary business affairs of life." Buchholz v. Cunningham, supra. And it was not error to exclude from the instruction an unqualified clause (nor was it error in refusing instructions proffered by appellants including the unqualified clause) that the testatrix must have had sufficient mind and memory to comprehend and know these things (as in the instruction stated) *without the aid of any other person*, especially in this case when testatrix was possessed of large estate of diversified investments. See Pulitzer v. Chapman, supra. The case of Pickett v. Cooper, 354 Mo. 910, 192 S. W. 2d 412, cited by ap-

pellants, did not treat with a contention of error in refusing to include such a clause in an instruction.

The judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton*, *CC.*, concur.

. PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court All the judges concur. .