246 S.W.2d 817 (1952)
WRIGHT
v.
STEVENS et al.
No. 42617.
Supreme Court of Missouri, Division No. 2.
March 10, 1952.
*818 Wm. R. McGuire, St. Louis, Wm. Barton, Robt. Hoelscher, Warrenton, for appellant.
Willima W. Van Matre, Jr., Mexico, Alvin H. Juergensmeyer, Warrenton, for respondents.
TIPTON, Judge.
This is a suit to contest the last will of W. A. Stevens, deceased, on the grounds that he lacked mental capacity and had been unduly influenced. At the close of the evidence of the contestant, the trial court directed a verdict for proponents, declaring the instrument introduced in evidence to be the last will and testament of W. A. Stevens, deceased.
The testator was a widower and lived on his farm in Warren County, Missouri. At the time of his death he was approximately 75 years old. He had an adopted daughter, Mabel Stevens Wright, the contestant, and two brothers, E. L. Stevens and John Stevens, who survive him. On April 11, 1949, the testator was admitted to St. Joseph's Hospital at St. Charles and he died there on May 23, 1949. On April 16, 1949 he executed the will in question. This will gave a 109 acre farm to the contestant. He gave his home place consisting of 80 acres to Ruth Wright Moreland, his grandaughter, She was the daughter of the contestant. He gave a 120 acre farm and the residue of his estate to his brother, E. L. Stevens.
Judge Theodore Bruere testified that on April 13, 1949 he was requested by E. L. Stevens to go to the hospital and see his brother; that on that date he went to see the testator who was in a double bedroom in which there was another man, but no one else was in the room; that testator told him that he had sent for him, that a Mr. Hall had suggested him and that he wanted him to draw his will. He further testified that he made notes on a piece of paper which was introduced in evidence; that the testator told him where the 3 farms were located in Warren County and who the grantors were in the deeds; and that he went to the courthouse of that county and easily located these farms from the information given him by testator. In other *819 words, testator knew how much property he had and from whom he acquired it. After returning from Warren County Judge Bruere prepared the will as he was directed by testator. He further testified as follows: "And he read the Will over and I read it to him and I think he made the statementI am pretty sure he made the statement that that was what he wanted. * * * Q. At the conclusion, when you read it and you presume he read it, what if anything did he say? A. He said, `This is what I want.'" He further testified that Mrs. Lessman and he witnessed the will. On cross-examination he testified that E. L. Stevens did not tell him anything about testator's property, only that he was in the hospital; that he was close to the testator and read the will in a loud voice so testator could hear as he was hard of hearing; and that E. L. Stevens paid him for his services several weeks later.
Carrie E. Lessman was a nurse at the hospital and was asked to witness the will. She closed the door as requested by deceased because he said he did not want anyone to hear what was going on; and Judge Bruere and she were the only ones in the room when the will was executed.
On cross-examination she testified that the testator was removed to another room; that he could not hear ordinary conversation, that the voice had to be raised when talking to him; that testator was nervous and rather shaky at the time he signed the will. She denied she assisted testator when he signed the will, denied she held his hand when the will was signed and denied the will was brought to testator the second time because he was too weak to sign it the first time.
Mrs. Mabel Stevens Wright, the contestant, testified that she had lived in St. Louis for 8 years prior to the trial in this case; that prior to that time she lived in Warren County; that she was testator's daughter and had lived with him until her marriage; that she and her husband farmed jointly with testator for about 19 years; that after she moved to St. Louis she visited her father regularly and the relation between her father and her was cordial and friendly; that she visited him the day he was brought to the hospital; that he had two pairs of glasses, one for reading and one he used to walk with; that he could not read script but only printing, and could not write except to sign his name; that her father was hard of hearing, that it was necessary to shout to make him hear; that he did not have his reading glasses at the hospital; and that she saw her father every day he was in the hospital. She further testified that the first day she visited him "he asked me how I was getting along, how my husband wasthe usual line of conversation. * * A. Well, he wanted me to come back the next day, which I did." She testified that on the next day, "Well, he didn't seem as well as he was the night before. * * He was some drowsy, not too much. He talked to me."
She testified that her father had stated that he did not believe in wills; that she saw E. L. Stevens about the hospital frequently the first two weeks and that one day he asked her to leave the room as he had some business to talk over with testator.
The following is a part of contestant's testimony:
"Q. (By Mr. McGuire) Mrs. Wright, when you saw your father there on the day and prior to the time that this Will was executed, could you carry on a coherent conversation with him? A. Not too good; no.
"Q. Would you explain for us his actions? A. Well, he was drowsy and he muttered to hisselfyou couldn't understand everything he said.
"Q. And would he answer a direct question if you would ask him? A. No, sir.
"Q. And was he in a nervous and shaky condition? A. Yes, sir, he was.
"Mr. Van Matre: We object to the leading.
"The Court: Objection sustained.
"Q. (By Mr. McGuire) Just explain his condition? A. He was just awful rocky.
"Q. What do you mean by `rocky'? A. I mean he was nervous. He was a *820 sick man and I don't think he knew what he was doing all of the time. * * *
"Q. (By Mr. McGuire) Mrs. Wright, taking all of those things into consideration, in your opinion was your father of sound or unsound mind on April 16, 1949, when this Will was executed?
"Mr. Van Matre: To that we object, Your Honor.
"The Court: Objection overruled.
"A. (By Witness) I think he was of unsound mind.
"Mr. Van Matre: We object to what she thinks.
"A. I say, he was of unsound mind, in my opinion.
"Q. (By Mr. McGuire) Will you elaborate in more detail as to what you base your opinion on? A. He was really upset, more or less. I think his brother had antagonized him, more or less.
"Mr. Van Matre: Now we object to that, Your Honor, and ask that the answer be stricken and the jury instructed to disregard that statement.
"The Court: The objection is sustained. That statement is ordered stricken from the record and the Jury is instructed to disregard it.
"Q. (By Mr. McGuire) Will you give us any other facts that you base your opinion on, that your father was of unsound mind? A. Well, he would be talking about one thing and then he would go off onto another thing.
"Q. In addition to all of those other things you have outlined? A. That's right."
On cross-examination the contestant testified as follows:
"Q. Do you think he was out of his mind? A. Not that day, I didn't.
"Q. What day was that now? A. The first day.
"Q. Was that the 11th? A. Yes. * *
"Q. He talked rationally, didn't he? A. He would sometimes, for a while. He didn't stay on that subject of the family very long. He would go off on something else. Usually he would be worrying about his stuff at home.
"Q. You say his mind would jump to worrying about things at home? A. That's right.
"Q. Do you want this Jury to believe that that was indicative to you of an unsound mind? He had a lot of stock and things out on the place, didn't he? A. Yes, he did.
"Q. He was worried about who was feeding them, wasn't he? A. That's right.
"Q. After he got through talking about the family, would he then start talking about his stock and his stuff out on his place? A. Yes, and about going home.
"Q. What else led you to believe he was irrational or out of his mind? (Witness pauses) Do you think talking about his stock was indicative of his being out of his mind? A. In a way.
"Q. You think wanting to get back home was indicative of his being out of his mind? A. He wanted to go back home. He didn't want to go to no nursing home.
"Q. Do you think that was indicative of being out of his mind? A. Yes, I did."
Juanita Spencer testified that she was employed as a waitress in the St. Charles Hotel and that Mrs. Lessman came into the hotel restaurant and told Mrs. Lewis, contestant's daughter, she had to hold testator's hand when he signed the will and also that it was necessary to bring the will twice for the testator to sign as he was too weak and sick to sign it the first time it was brought to him. Mrs. Lewis corroborated this witness.
John Robert Wright testified he was the husband of contestant; that testator was very hard of hearing; that it was necessary to shout to make him hear; that he saw testator the evening the will was signed and testator was very nervous and weak; that he did not want to talk; that he signed papers for an operation; that testator told him not to let contestant sell any of the land, to make her keep it all together; that testator worried about his livestock and farm; that the witness found a renter for some of testator's land at his request after he was in the hospital; and that testator did not believe in wills *821 because he and E. L. Stevens "had broken a will of a relative."
Several of testator's neighbors testified in behalf of the contestant but their testimony did not go to the issues before us. In fact, several of these witnesses stated that it was their opinion that testator was of sound mind as far as they knew.
In determining the sufficiency of contestant's evidence we must put the proponents' evidence out of consideration except as it may aid contestant's case and must accept her evidence as true. We must give her the benefit of every inference legitimately to be drawn therefrom to determine whether there was substantial evidence to submit the issues to the jury. Norton v. Johnson, 359 Mo. 1214, 226 S.W.2d 689; Pickett v. Cooper, 354 Mo. 910, 192 S.W.2d 412; Smith v. Fitzjohn, 354 Mo. 137, 188 S.W.2d 832; Fowler v. Fowler, 318 Mo. 1078, 2 S.W.2d 707.
Contestant in her brief says: "While proponents made their prima facie case by the testimony of the two subscribing witnesses, an examination of the circumstances and the testimony lends support to plaintiff's case." The only grounds alleged in contestant's petition why the will was not the last will of W. A. Stevens are (1) undue influence and (2) that he "was not of sound and disposing mind and memory at the time of the alleged execution of said pretended and purported will and was without testamentary capacity." Therefore, these are the only two issues before us for review.
The evidence most favorable to contestant on the issue of undue influence is as follows: E. L. Stevens asked contestant to leave testator's room at the hospital as he had some business to transact with his brother, the testator; and that E. L. Stevens went to the law office of Judge Bruere and told him that the testator was in the hospital and wanted to see him about preparing a will. He did not tell Judge Bruere anything about the testator's property or how the will was to be drawn. E. L. Stevens was not present when Judge Bruere first visited the testator nor was he present when the will was executed. Judge Bruere testified that testator knew about his property, and its location and the names of the grantors in the various deeds that conveyed the property to testator. Contestant's witness, her husband, testified that at the request of testator he went to Warren County and rented some crop land for testator. This was the same period of time the will was prepared. Witness Lessman denied that it took two efforts to get the testator to sign the will, while several witnesses for contestant testified they heard her say that it took two efforts before testator signed the will. This is impeaching evidence and if it has any probative force it would go mainly to the execution of the will. The evidence shows that E. L. Stevens paid Judge Bruere for his services in preparing the will but it does not show whether he paid it personally or as executor of his deceased brother's estate.
To invalidate a will the undue influence must have been present, in active exercise and sufficient to destroy the free agency of the testator at the time of making the will which is not, in fact, his own will but that of the party who was exercising the undue influence. Beckmann v. Beckmann, 331 Mo. 133, 52 S.W.2d 818; Baker v. Spears, 357 Mo. 601, 210 S.W.2d 13. Undue influence may be shown indirectly and arise as a natural inference from other facts in the case. It must not rest on mere opportunity to influence or on mere suspicion. In order to afford substantial foundation for such inference there must be evidence that the beneficiary was active in some way which caused the execution of the will. But the additional inference of activity and the resulting inference of undue influence may not rest on conjecture but must be based upon evidence, circumstantial or otherwise, from which the necessary inferences may be fairly drawn. Baker v. Spears, supra.
The mere fact that a person sick in a hospital asks his brother to get a certain lawyer to prepare a will for him and the sick person makes this brother one of the beneficiaries is not sufficient evidence under the authorities to which we have just referred to rule that the will was the result of undue influence. And this is *822 true, even if the lawyer was paid some weeks after the testator died by the brother. We hold that the trial court properly directed a verdict for the proponents of the will on the issue of undue influence.
The only witness who testified that testator was of unsound mind was the contestant, Mrs. Mabel Stevens Wright. She testified that he did not carry on "a coherent conversation very well"; that he was drowsy, nervous and shaky; that he was sick; and that "he would be talking about one thing and then he would go off onto another thing." She testified that taking these facts into consideration she was of the opinion that the testator "was of unsound mind."
The rule in this state is that a lay witness is not competent to testify that, in the opinion of such witness, a person is of unsound mind or insane without first relating the facts upon which such opinion is based. And when such facts have been stated by a lay witness, unless these facts are inconsistent with the person's sanity, the opinion of such lay witness that the person under consideration was of unsound mind is not admissible in evidence. Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772; Platt v. Platt, 343 Mo. 745, 123 S.W.2d 54; Lee v. Ullery, 346 Mo. 236, 140 S.W.2d 5.
"In this connection it has repeatedly been determined that evidence of sickness, old age, peculiarities, eccentricities in dress or oddities of habit, forgetfulness, inability to recognize friends, feebleness resulting from illness, and other facts or circumstances not inconsistent with the ability to understand the ordinary affairs of life, comprehend the nature and extent of one's property and the natural objects of his bounty, and which are not inconsistent with sanity, cannot be used as a basis for the opinion testimony of a lay witness that a person is of unsound mind or insane. Berkemeier v. Reller, 317 Mo. 614, 296 S.W. 739, 753; Loehr v. Starke, supra; Smarr v. Smarr, 319 Mo. 1153, 6 S.W.2d 860, 864; Nute v. Fry, supra [341 Mo. 1138, 111 S.W.2d 84]." Lee v. Ullery, supra, 140 S.W.2d loc. cit. 10.
Tested by these rules, the statement by this witness that testator was of unsound mind had no probative force and the trial court properly directed a verdict upon the issue of mental incapacity.
It follows that the judgment should be affirmed. It is so ordered.
All concur.