Ida May AARON, Appellant,

v.

Ruth C. DEGNAN and Margaret Travers, Respondents,

and

Charles Miller, Henry Miller and Sarah Smith, Defendants.

No. 43840.

Supreme Court of Missouri.

Division No. 1.

Nov. 8, 1954.

Meyer, Hoester & Coleman, Hal B. Coleman, Clayton, for appellant.

Francis R. Stout, Richard M. Stout, St. Louis, for respondents.

HOLLINGSWORTH, Judge.

This is an action to contest the will of John Miller, deceased, on the ground of undue influence. The jury was unable to agree upon a verdict and a mistrial was declared. Thereafter, on the same day, proponents, in accordance with their trial motion for a directed verdict, filed a motion for judgment, which the trial court sustained and judgment was entered declaring the will valid. Plaintiff appealed, contending the evidence shows that a fiduciary relationship existed between testator and proponents at the time the will was executed which "gave rise to a presumption of undue influence sufficient to take the case to the jury."

The estate consists solely of personalty of the inventoried value of $15,253.65, which, if the will be not sustained, would pass to plaintiff, thereby vesting this court with jurisdiction under the provisions of Art. V, Sec. 3, of the Constitution, V.A.M.S.

Testator, a widower aged 65–67 years, died a resident of the City of St. Louis on February 7, 1952. He had been thrice married. Plaintiff, Ida May Aaron, is his daughter by his first marriage and his sole heir. He was also survived by two brothers, Charles and Henry and a sister, Sarah, who were made parties to the suit but did not participate therein. Proponents, Ruth C. Degnan and Margaret Travers, are the sisters of testator's third wife, Marie, who predeceased him on September 14, 1951.

By his will dated October 3, 1951, testator bequeathed to plaintiff the sum of $500, to each of his brothers and sister the sum of $25, and to proponents the residue of his estate, naming them executrices "without bond".

At the time of his death on February 7, 1952, and for many years prior thereto, testator owned and operated a jewelry store and pawnshop at Sixth and Pine Streets in the City of St. Louis. Plaintiff was born in St. Louis on May 11, 1924, but immediately was taken away from St. Louis to live with her mother's relatives and was never thereafter domiciled with her father. Following termination of his first and second marriages, testator married his last wife, Marie, in December of 1947 or 1948. In April of 1949, he executed a will very similar in form and phraseology to the will here in question,

in which he bequeathed to plaintiff the sum of $50, to each of his brothers and sister the sum of $5, and to his wife, Marie, the residue of his estate, naming her as executrix "without bond". Both wills were drawn by John Reardon, testator's attorney and legal adviser of many years.

There is no question as to testator's mental attributes and condition at all the times herein mentioned. Some twelve witnesses, including John Reardon, his attorney, and Ben Smith, a longtime employee, both of whom witnessed the will in issue, his priest, his physician, and nurses who had attended him during times spent by him at the hospital both prior and subsequent to the execution of the will here in question, testified that he was of "sound mind", "strong-willed", "forceful", and that he so remained until his death. Plaintiff herself testified that in October, 1951, when he executed the will he was of sound mind and further described him as being "strong-minded and bullheaded", "positive". There was no evidence to the contrary.

In 1949, testator began to suffer from chest pains and coughing spells and, it seems, he was in a hospital on one or more occasions in 1949 and 1950. In March of 1951, Dr. Vincent Joseph LoPiccolo became his physician and thereafter treated him until testator's death on February 7, 1952. Testator was then suffering from a malignancy of a gland in his chest that developed into cancer of the lung. He was hospitalized on March 14, 1951, for ten days, and from July 31, 1951, until September 1, 1951. On December 26, 1951, he went to the hospital and remained there until his death. When he was in the hospital, morphine and codeine were administered to him and when he was out of the hospital codeine was prescribed for him, but he never took either in sufficient quantities to affect his mind.

The first two hospital visits in 1951 were helpful to testator. When he returned to his home on September 1, 1951, his color was good and he felt better. Although he continued to go to the store and supervise it, he was not as active as theretofore. Marie, considerably younger than testator, died suddenly of a heart attack. He was devoted to her and was shocked and grieved by her death.

John Reardon testified that "approximately" on October 3, 1951, testator alone came to his office and told him that he wanted a will drawn and what he wanted incorporated therein, the different bequests. He prepared the will in question in accord with testator's directions and took it over to testator's store where testator signed it and he and Ben Smith, an employee of testator, witnessed it. Later in his testimony Reardon said the will may have been typed in his office when testator was there and at that time delivered to testator and that he may have gone to testator's store to witness it at a later date when testator called him there for that purpose.

Ben Smith, Jr., testified: He was employed by testator as a watchmaker from August, 1949, until testator's death in February, 1952. He and John Reardon witnessed the will in question. Mr. Reardon brought the will into the store and it was signed by testator and the witnesses at a counter in the front portion of the store. Mrs. Travers was then back of a glass enclosure. He did not think Mrs. Degnan was in the store on that occasion.

Smith further testified: Testator's wife, Marie, actively assisted testator in his business so long as she lived, in making appraisals and in buying and selling merchandise. Proponents "helped out" at the store after Marie's death. They were "in and out", but worked there steadily for about three weeks before Christmas of 1951. Mrs. Travers took care of the loan department at that time. Mrs. Degnan was employed elsewhere, but did help in the store occasionally, "marking" jewelry. Plaintiff also came to the store frequently on Saturdays and "helped out". Neither Mrs. Travers nor Mrs. Degnan gave witness orders. When testator was there, testator was in charge. When testator was in the hospital, witness was "more or less" in charge.

When testator went to the hospital the last time, December 26, 1951, Mrs. Travers thereafter came daily to the store.

Anthony J. Kloeppel, a detective sergeant who had known testator for many years, testified that testator told him one morning that he had been to Reardon's office to get his will changed and about two weeks later testator, holding an envelope in his hand, said to witness that he had just got the will back from Reardon and told him the contents thereof.

Louis J. Gualdoni testified: He is manager of Kiel Auditorium. He knew testator for many years, was his close friend and did business with him. After Marie's death, testator told him that proponents were good to him, took care of him when he was sick. Testator also told him that he wanted his daughter (plaintiff) to come into the store and help him, but she would not stay any length of time.

Both proponents testified that testator never discussed his will with either of them prior to its execution. On the day following Marie's death, they heard testator call John Reardon and tell him that he wanted to take care of his will after the funeral was over. Mrs. Travers testified that after Mr. Reardon left the store following the execution and witnessing of the will, testator came back of the enclosure, showed her the will, which she read, and told her where he was putting it, in the safe, to which she had access, and said to her, "If anything happens to me, you are the only one that knows where this is. Get yourself a lawyer and give this to the lawyer. Don't let anybody have their hands on it." He also said, "I have got it all fixed; it is ironclad. * * * you are without bond." He also said that "we were so good to him, that he could always depend upon us, we were always at his side when he was sick or needed us at anytime at all." He also told Mrs. Degnan about the will after it had been executed.

Proponents' further testimony was that when Marie died plaintiff and proponents came into testator's home and took care of the funeral arrangements. On Tuesday

following the funeral testator told plaintiff that she had her job (employment) to do and that she should return to work. Mrs. Travers, although not expressly asked by testator to do so, stayed in testator's home for three weeks thereafter, taking care of him and his home until her and Mrs. Degnan's father could come to stay with and look after him. Mrs. Degnan also assisted. Testator preferred to keep his home, rather than go to Mrs. Travers' home. Proponents did not move into his home, but spent much time there, returning to their own homes for changes of clothing. At the end of the three weeks period their father, aged 83 years, moved into testator's home and assisted him in taking medicine and his other personal needs as required, until testator went to the hospital for his last illness. After Marie's death Mrs. Degnan took testator to and from the store in a car. Both proponents cooked for him when they stayed at his home. Neither was paid anything for the services rendered, but he did give them jewelry and some of Marie's effects. When he was in the hospital during his last illness, both proponents visited him regularly, and assisted in nursing him during both day and night.

Plaintiff was the only witness in her behalf. In addition to her testimony as to testator's mental soundness when the will in question was executed, as hereinabove set forth, she testified: She lives in St. Louis. She remembers that when she was a little girl the woman who took care of her brought her on two occasions to St. Louis to see her father and he had his girl friend buy her some clothing. She next saw him when she was about thirteen years old. She happened to be in St. Louis, went to see her father's brother and learned that her father had a jewelry store and went to see him. He gave her a bracelet and some money and they talked about her mother. Thereafter, she visited him "now and then". After these visits she and her aunt with whom she lived had a disagreement, and plaintiff went to her father. He just had a room, so she stayed with his girl friend, Marie, who later became his wife. She visited with her mother's relatives during

the summer vacation, but the following September (1939 or 1940) she lived with Marie and went to high school until December, during which time she saw her father daily. He ate with her and Marie and plaintiff would also visit him at the store. Witness and her father did not always agree, she guessed "like a natural home would be." In December (1939 or 1940), she returned to her aunt's home. She saw her father "a couple of times" the ensuing year. She was married in 1944, but in July, 1946, separated from her husband. She has lived in St. Louis since 1946. She has an eight-year-old son, who lives with her. In 1946 she lived with her mother's relatives for about three months, during which time she and her son visited her father at the store and frequently ate meals with him. She started to work in September and continued to work throughout the year. She moved to St. Louis County with a woman who took care of her son while she worked. Her father had an apartment and Marie lived in the same building. Plaintiff worked in her father's store during the "split hours" of her regular employment as a telephone operator. That assistance at the store continued during a period of time when he and Marie had broken off their association. She never worked at the store after they "made up". Marie worked in the store both before and after her marriage to plaintiff's father.

Plaintiff's father became ill in 1949. She continued to visit him and take meals with him and when he was in the hospital she visited him there. Their relations were cordial, they had "differences" on two occasions, but no "big fights", and always "made up". She also visited her father in 1950. He and her son got along fine. Her father and Marie bought most of his clothing. Her father wanted her son to be a doctor and led plaintiff to believe that he would pay for it. He gave both her son and her presents and clothing. He gave her some of Marie's effects after Marie died. After Marie's death, her father lost weight, was nervous, his head bobbed, he spilt his coffee, he coughed very hard and was in great pain. He did not dress as neatly as formerly.

The first time plaintiff went into the store after Marie's death, her father and Mrs. Degnan and Mrs. Travers and their father were in there. Thereafter she saw Mrs. Degnan, Mrs. Travers and their brother in the store. She went to her father's home twice after Marie's death and had dinner there once with Mrs. Degnan and several of Mrs. Degnan's relatives. At that time it "seemed like everything I did was watched" by Marie's family. A similar occurrence took place during the next week and plaintiff "felt very uncomfortable", "out of place". She never visited her father again in his home. On Christmas following Marie's death, her father bought her and her son presents. He also gave her son a ring with a diamond in it and said to him, "As you grow older it will grow bigger."

Plaintiff regularly visited her father at the hospital during his last illness. After the first couple of weeks Mrs. Degnan and Mrs. Travers were always there. He was very ill. On two occasions he seemed to be confused. On another occasion her father told her that he would "set up in business" the man she was then associating with and that all he had left to do was to try to make her happy.

Plaintiff further testified: While her father was at the hospital during his last illness, Mrs. Travers wanted him to sign a rent check. He at first refused to sign it, but she persuaded him to do so. Mrs Travers ran the business while testator was in the hospital. On one occasion during that period, Mrs. Travers discontinued a long-standing advertisement for the purchase of old gold and testator "had quite a fit about it". On another occasion, friends were urging plaintiff to help her father in his business after Marie's death, and plaintiff did not know what to do. Ruth Degnan said to her, "Your Dad doesn't always like what we do, but he doesn't say anything." On another occasion, Mrs. Travers insisted upon cooking dinner for him at his home, and he told her, "No", he was tired, and Mrs. Travers said, "Don't get excited, John, you are not well", and Mrs. Travers then asked plaintiff to come up and have dinner

also, but witness said, "No", and "they (Mrs. Travers and testator) went back to his house and had dinner". On another occasion during testator's last illness, the nurse insisted upon putting sideboards on testator's bed and plaintiff also thought it advisable for his own protection. Testator objected to it, but it was done. On two occasions proponents and plaintiff were visiting testator in the hospital during his last illness, and he said he was tired and wanted them to leave, but Mrs. Travers insisted upon staying until he went to sleep. Witness also narrated an incident wherein Marie at one time convinced testator that a diamond-set bar pin which he wanted to purchase for resale "wasn't a good deal". Witness said the above narrated incidents were the only ones she could remember that showed instances of his being influenced by anyone.

It is urged by proponents that the evidence in this case and all reasonable inferences flowing therefrom, considered in the light most favorable to plaintiff, fail to make a submissible issue of any fiduciary relationship existing between testator and proponents at the time the will in question was executed. Certainly, no facts are shown warranting a finding of the existence of such a relationship prior to Marie's death on September 14, 1951. Concededly, testator was a "strong-minded", "positive" man between the date of Marie's death and the date of execution of the will on October 3, 1951,—a period of nineteen days—and thereafter. Proponents would indeed have been fast and persuasive workers to have established a relationship between themselves and testator within that period of time such as would warrant an inference of their ability to exert an undue influence over him.

■ But assuming, without deciding, that a confidential and fiduciary relationship did exist between proponents and testator when the will was executed, yet that fact alone does not raise a presumption of the exercise of undue influence. Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772, 776 et seq. (4, 5); Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449, 452(1–3). To invalidate the will there must be evidence from which it may be inferred that undue influence was present in active exercise and sufficient to destroy the free agency of testator at the time of making the will, so that it is not in fact testator's will but that of the proponents. Baker v. Spears, 357 Mo. 601, 210 S.W.2d 13, 18(5); Snell v. Seek, 363 Mo. 225, 250 S.W.2d 336, 341(5); Glover v. Bruce, Mo.Sup., 265 S.W.2d 346, 353(5–10), and cases cited therein. An inference of undue influence cannot rest upon a mere opportunity to influence or upon mere suspicion. Baker v. Spears, 357 Mo. 601, 210 S.W.2d 13, 17(1–4), and cases therein cited.

■ There is no evidence, direct or circumstantial, from which it may be inferred that either of the proponents or testator ever mentioned or suggested to the other the making of this will or any other will or that proponents knew what its contents would or might likely be prior to its execution. Neither is there any evidence from which it may be inferred that either of proponents engaged in any activity in, or connived at, its conception in the mind of testator, or in its procurement or execution. True, proponents heard testator call his attorney the day after Marie died and tell him that he desired to change his will after the funeral. We can attach no significance to that fact. True, testator showed Mrs. Travers the will immediately after it was executed, told her he was placing it in his safe, to which she had access, and that she was to take it to a lawyer upon his death, and later told Mrs. Degnan of its contents. That was a natural and prudent thing to do.

We have set forth with meticulous detail plaintiff's favorable testimony. It speaks for itself. It reveals no fact or incident from which an inference may be drawn that either of the proponents could easily persuade testator to do anything. Rather, it tends to show that even during his last illness, long after execution of the will, he was insistent upon doing as he wished, although not always successful.

We have carefully considered the cases cited by plaintiff, including: Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772; Snell v. Seek, 363 Mo. 225, 250 S.W.2d 336; Machens v. Machens, Mo.Sup., 263 S.W.2d 724; Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842; Patton v. Shelton, 328 Mo. 631, 40 S.W.2d 706. The Loehr and Snell cases are hereinabove cited. They are not helpful to plaintiff. The Machens and Clark cases are distinguishable on the facts. In both, there was evidence that clearly warranted an inference of the active exercise of undue influence. The Patton case was decided prior to Loehr v. Starke, supra, and to the extent it held that a fiduciary relationship alone raised a presumption of the exercise of undue influence was overruled by the latter case.

The judgment should be and is affirmed.

All concur.