261 S.W.2d 918 (1953)
MICHAELSON et al.
v.
WOLF.
No. 43263.
Supreme Court of Missouri, Division No. 2.
October 12, 1953.
Motion for Rehearing or for Transfer to Denied November 9, 1953.
*919 Barnett & Skeer, Ben E. Pener, Kansas City, for appellants.
Howell, Jacobs & Howell, Floyd E. Jacobs, Dean Wood, Kansas City, for respondent.
Motion for Rehearing or for Transfer to Court en Banc Denied November 9, 1953.
BOHLING, Commissioner.
Bernice Michaelson and Bessie Kramer, the daughters of Solomon Jerry (known in the record as Jerry) and Rosa Wolf, instituted this action against Edward J. Wolf, their brother, to recover two-thirds of $40,000 transferred to him by the father by means of a check shortly before the father's death and during his last sickness upon the theory the transfer was without consideration and was not intended as a gift and upon the theory the transfer was the result of undue influence exercised by the defendant over the father. The trial court considered plaintiffs had failed to make a submissible case at the close of all the evidence and directed a verdict for defendant. The record and the briefs are lengthy.
In an action at law upon a motion for a directed verdict, a defendant admits the truth of all testimony, including testimony adduced by defendant, favorable to a plaintiff and all legitimate inferences therefrom favorable to plaintiff. Wright v. Stevens, Mo., 246 S.W.2d 817, 821[1]; Hahn v. Brueseke, 348 Mo. 708, 155 S.W.2d 98, 100[1, 2]; Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 141[1-8]. A plaintiff's prima facie case is not destroyed by a defendant's rebutting testimony. Johnson v. Chicago & E. I. R. Co., 334 Mo. 22, 30[1], 64 S.W.2d 674, 677[1-3]; Van Brock v. *920 First Nat. Bank, 349 Mo. 425, 161 S.W.2d 258, 262[7].
Jerry Wolf was a member of the Traders Livestock Exchange at the Kansas City stockyards. He bought, sorted and sold cattle. Abe Wolf, a cousin, and he were partners, the firm being Wolf and Wolf. Defendant went to work for the firm in 1907, and learned the business from the ground up. Abe Wolf retired about 1921. Jerry Wolf made his son an equal partner with him in 1923. In 1928 Lester Metzger became a partner, the firm being known as Wolf and Metzger, and each partner participated on a one-third basis.
Edward J. Wolf was a competent and successful trader. He made virtually all the important decisions of the firm for a number of years. Jerry Wolf gave him credit for the success of the partnership, stating he was going to see that Edward got the business. He transferred two seats on the Traders Exchange, worth $250 to $300 each, to Edward in 1931.
Pat Corcoran and Marie Corcoran, husband and wife did office work and kept the books for Wolf and Metzger. The profit or loss on partnership transactions would be debited or credited from the partnership profit and loss account to each individual partner's ledger sheet in equal shares. An inventory of the cattle was taken practically every week, and whatever interest an individual partner had in the business would be reflected on his ledger sheet if the cattle were worth their book value. Each partner would draw against the firm account for firm and also personal transactions, the personal checks being charged on the partner's ledger sheet. An accountant annually checked the records and adjusted the accounts that each partner ultimately would draw equal amounts.
Pat Corcoran, plaintiffs' witness, testified that Jerry Wolf telephoned on September 26, 1946, and asked him to bring out the small checks, 8 or 9, he had had Mrs. Corcoran make out the day before, and some blank checks for the firm account and for his personal account. Jerry Wolf would give his relatives small checks ($10 to $25) on Jewish holidays. Mr. Corcoran arrived at Jerry Wolf's home, 7432 Tracy, Kansas City, Missouri, between 5 and 6 p. m. Mr. Corcoran went to the bedroom, where Mr. Wolf was sitting on the edge of the bed. Mrs. Wolf was also in the room. In about 20 minutes Edward J. Wolf and Harold Waxman, a lawyer, arrived. Mr. Waxman was the son of Mrs. Wolf's sister.
Jerry Wolf signed the small checks and "gave them to Ed, his boy, to distribute." He asked Mr. Corcoran how much was to his credit in his personal account. The witness told him, and Jerry Wolf directed him to make a check for that amount and deposit it so Mrs. Wolf could open an account. Mr. Corcoran then wrote a check for $1,570.90 to Mrs. S. J. Wolf and Jerry Wolf signed it. (Witness later deposited this check to Mrs. Wolf's account.)
Jerry Wolf then said "Now, I want to make a check for Ed." Witness asked: "On what account?" Jerry Wolf said: "The firm." Witness asked: "For how much?" He said: "$40,000." At that time Jerry Wolf had a personal credit on his ledger sheet of approximately $50,000 Witness said: "Jerry, I don't think you are leaving enough there to pay your income tax." Mr. Wolf said: "Well, Ed and Mamma will take care of that." A discussion arose as to how to write the check and witness thought Mr. Waxman suggested that, instead of making it to Edward J. Wolf, the check be made payable to Jerry Wolf and that Jerry endorse it to Edward. Mr. Corcoran thereupon wrote a check against the Wolf and Metzger partnership account for $40,000, payable to "S. J. Wolf," and on the back of the check "Pay to the order of Edw. J. Wolf." Jerry Wolf thereupon signed the check and the endorsement "S. J. Wolf," and handed the check to Edward J. Wolf. During the transaction neither Edward J. Wolf nor Rosa Wolf, who were in the room, said anything.
Jerry Wolf never did say what the $40,000 check was for or why he wanted it made out.
*921 The $40,000 check was endorsed by Edward J. Wolf and deposited to his personal credit September 27, 1946.
Jerry Wolf executed a new will immediately following the $40,000 check transaction. Jerry Wolf and Rosa Wolf had executed mutual wills in 1920. After providing for the payment of debts and expenses, each gave $100 to each of their three children, and then passed the residue of the estate to the survivor so long as he or she remained single, and in the event of remarriage the survivor held one-half of said residuary estate in trust for the children, share and share alike, and the other half absolutely. Jerry Wolf's new or modernized will provided for the payment of debts and expenses, gave each child $100, and the residue of the estate to Rosa Wolf, and named Edward J. Wolf executor. The change was the omission of the provision respecting remarriage. Mrs. Wolf at that time was 76 or 77 years old. Edward J. Wolf did not say anything during the writing of the new will.
Jerry Wolf was not as active as formerly during the last 4 or 5 years of his life. He came to the office between 9:30 and 10:00 a. m., spent more time in the office, signing checks etc., than in the yards. However, he was in the yards selling cattle within the last year of his life. He was confined to his home and a hospital for the last 6 or 7 months of his life with a heart ailment. He returned to his home from the hospital September 4th, executed the instruments hereinbefore mentioned on September 26th, and returned to the hospital September 28th, where he died November 2, 1946, at the age of 82 years.
Rosa Wolf, after an illness of three weeks, died May 24, 1947.
Edward J. Wolf, as executor, administered the estate of Solomon Jerry Wolf, deceased, as well as the partnership estate, and was finally discharged February 19, 1948. The inventory showed the following assets: Cemetery lots, $250. Clothing, etc., $200. Membership in Traders Exchange, $350. Interest in Wolf and Metzger, $11,728.78. (Total, $12,528.78.) A Federal estate tax return shows real estate held by Mr. and Mrs. Wolf, with right of survivorship in Mrs. Wolf, valued at $17,750 and Mrs. Wolf the beneficiary of $17,000 life insurance. The Probate Court made allowances totaling $3,400 to Mrs. Wolf in December, 1946. Sections 462.450, 462.460 RS Mo 1949, V.A.M.S. Jerry Wolf's gross income for 1946 (November 1) was $39,134.65, which was subject to a Federal income tax of $11,582.06. The State income tax was $770.91. A Federal gift tax of $217.50 was assessed. It appears that the executor paid a Federal estate tax of $385.76 and a State inheritance tax of $351.15 on $33,007.58 passing to Edward J. Wolf.
The Federal income tax was paid by Mrs. Wolf using her $3,400 allowance to purchase a cashier's check dated January 15, 1947, payable to the Collector of Internal Revenue, by Edward J. Wolf paying $5,543.63, and by the Jerry Wolf estate paying the balance.
Edward J. Wolf, as administrator with the will annexed, administered the estate of Rosa Wolf, deceased. Each child was entitled to one-third of her estate, her husband having predeceased her. The inventory disclosed: Real estate, $34,481.74. Bank account, $649.28. Furnishings in apartment building, $1,100. Furnishings at 2118 East 70th street terrace, $750. Her estate was fully administered and the administrator discharged September 28, 1948.
The $40,000 check was not reflected in the inventory of either estate.
We summarize some of the testimony.
Virginia Thompson, one of Jerry Wolf's nurses, testified that in October, 1946, he spoke affectionately of his family, mentioning his granddaughter and her mother, Bernice Michaelson, and told her that his children had nothing to worry about, "he had his family taken care of, they need have no worry." Gladys C. Stinson, another nurse, testified that just prior to his death his granddaughter talked to him and after she left his last intelligible words were: "God bless my family."
*922 Returning home from Mr. Wolf's funeral with Mrs. Michaelson and Edward Wolf, Rosa Wolf remarked that Mr. Wolf had left her a wealthy woman. Defendant said nothing in response to this.
Notwithstanding the testimony of Patrick Corcoran, who was an employee of Wolf and Metzger but a witness for plaintiff, that Jerry Wolf told him his daughters had cost him "tons of money" and "Eddy" had not cost him anything, and that, during the last two or three years of his life, Bernice Michaelson and her daughter were not treating Mrs. Wolf and him properly, there was much testimony from which a jury could find that Mr. and Mrs. Wolf thought well of their daughters and granddaughter.
The husbands of the daughters experienced financial difficulties and Jerry Wolf assisted them. Bessie Kramer testified her father was good to her, forwarding her money whenever she asked for it. She never asked for money after 1924, but he continued to forward small gifts. Robert Kramer, her husband, estimated what they had received, and in 1919 and 1920 voluntarily forwarded two notes, totaling $1,972, to Jerry Wolf. Jerry Wolf had possession of the notes at his death, but Mrs. Kramer testified they transferred their equity in Montana land to take care of the notes and Jerry Wolf, after holding the land for many years, sold it for $2,000. They lived in the State of California for a number of years, and, we understand, in the early 1940's Mr. Kramer suffered a stroke. He was unable to work and Mrs. Kramer worked to provide for her family. Her parents knew this as she communicated with them. She had three sons and a daughter. Her husband's condition prevented her attending the funerals of her father and mother. Robert Kramer died five weeks after Mrs. Wolf's death, and she then came to Kansas City.
Bernice Wolf married David Michaelson. He was a diamond setter and available positions were few. They had a daughter, Ruth. Jerry Wolf had possession of a $500 note of Mr. Michaelson's at his death, which Mrs. Michaelson testified they had paid in small weekly amounts to her mother. Mr. Michaelson suffered a heart attack in 1939, which affected his ability to work continuously and he was unable to work after 1947. The Michaelsons, while in Kansas City, were provided with a home, rent free, by Jerry Wolf. They helped Mr. and Mrs. Wolf with their properties. On December 10, 1945, Jerry and Rosa Wolf purchased a home at 2118 E. 70th street terrace, including the furniture, that Bernice and her daughter might be near them. After Mr. Wolf was taken to the hospital on September 28, 1946, Rosa Wolf had the Michaelsons move in with her. Bernice Michaelson started working in 1942 and her parents knew this. David Michaelson died in July, 1951.
Each partner of Wolf and Metzger, including defendant, had yearly earnings, before taxes, as follows: From 1936 to 1941, between $5,000 and $9,350. 1942, $15,781.90. 1943, $25,385.99. 1944, $14,986.54. 1945, $33,779.86. To November 2, 1946, $39,134.65.
Edward J. Wolf wrote Bessie Kramer July 3, 1947, stating, among other things, that their father had been in the hospital, part of the time in an oxygen tent, for eleven weeks; that he came home for three weeks and was again taken to the hospital; that his illness cost nearly $6,000; that their mother passed away; that the "folks" left specified pieces of real estate; that Mrs. Wolf had "several thousand dollars" in the bank, and: "It will take quite a bit of money to take care of the inheritance taxes as mother hadn't paid on what she inherited from dad, and now they will have to be paid on both estates, both state and federal which means we will have to pay four inheritance taxes all told. Harold Waxman is taking care of everything for us and is trying to get us off as easy as possible, but am afraid it will take quite a bit of the cash that was left to clear this." This letter did not mention the $40,000 check.
Plaintiffs do not claim that Jerry Wolf was incompetent.
*923 Bernice Michaelson talked to a young lawyer in 1949 who informed her about records being kept in the Probate Court. She had him investigate her father's estate. He reported the records disclosed that Jerry Wolf executed a new will and gave a check for $40,000 a few days before he died. She then first learned of the $40,000 check. She wrote her sister Bessie Kramer, and that was the first Mrs. Kramer knew of the check.
Defendant says plaintiffs may not maintain their action because he did not waive administration de bonis non on the estates of Jerry Wolf and Rosa Wolf and, because of want of unanimous consent, further administrations of said estates had to be applied for under § 461.540 and an administrator de bonis non of the estate of Jerry Wolf, deceased, had to be appointed for the prosecution of the action; citing Section 461.540 RSMo 1949, V.A.M.S.; Griesel v. Jones, 123 Mo.App. 45, 56, 99 S.W. 769, 771, 772, and Odom v. Langston, 351 Mo. 609, 624, 173 S.W.2d 826, 835-837.
Section 461.540, so far as material, reads (emphasis ours): "If * * * after final settlement of an estate is had and the executor or administrator has been discharged, unadministered assets of the estate be discovered after such final discharge, and there are unpaid allowed demands against said estate in cases not otherwise provided for, letters of administration of the goods remaining unadministered shall be granted * * *; provided, that if, after final settlement of an estate is had and the executor or administrator has been discharged, unadministered assets of the estate be discovered and there are no unpaid allowed demands against said estate, letters of administration of the goods remaining unadministered may, if good cause be shown, be granted * * *."
The legal title to the personal property of a decedent passes primarily to his executor or administrator, from whom the distributees receive it in the course of the administration. Odom v. Langston, supra. The Odom case was an action by the heirs of a decedent to set aside a written trust agreement covering personal property and to recover the property for themselves. A will contest and the administration of testatrix' estate were pending. The court considered that the administrator was an indispensable party plaintiff in suits for the personalty of an estate in probate; and that the heirs, at least until their status be determined in the will contest, were in no position to attack the trust instrument.
In Griesel v. Jones, supra, there had been no administration on the intestate father's estate. The heirs had not agreed on or consented to a "domestic distribution" of his estate. In these circumstances it was considered that no heir against his will was to be deprived of the benefit and protection of an administration of the estate.
In the instant case the estates of Jerry Wolf and of Rosa Wolf have been settled; the executor and administrator have been discharged; and there are no unpaid allowed demands against either estate. All the interested parties (heirs or distributees) are before the court. In these circumstances the proviso, quoted supra, to § 461.540, added by Laws 1943, p. 306, authorizing an administration de bonis non of discovered unadministered assets "if good cause be shown" is permissive in nature and not compulsory. No good cause or special reason appears of record why the rights of the parties may not be determined without the expense and inconvenience of a second administration for the distribution of any discovered unadministered assets. This is the conclusion reached in Cheney v. Garibaldi, 345 Ill.App. 509, 104 N.E.2d 114, in construing § 461.540 in an action instituted in Illinois by those entitled to the assets against the maker of a note discovered after the estate of the payee had been closed. The proviso is consistent with the position taken in Missouri cases prior to its enactment in 1943. Pullis v. Pullis, 127 Mo.App. 294, 299, 105 S.W. 275, 276; Nord v. Nord, Mo.App., 91 S.W.2d 223, 226; Derge v. Hill, 103 Mo.App. 281, 77 S.W. 105.
Defendant has failed to establish his contention.
*924 Defendant had the burden of proof on the issue of a gift of the $40,000 check.
The general rule is that the burden of proof rests upon the party, as determined by the pleadings, asserting the affirmative of an issue. Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S.W. 1043, 1048[8]; Clapper v. Lakin, 343 Mo. 710, 123 S.W.2d 27, 33. Plaintiffs alleged that the $40,000 check was wrongfully converted by defendant to his own use; that it was not a gift; and that the execution, endorsement and delivery of the check were the result of undue influence exercised by defendant over Jerry Wolf. Defendant alleged the $40,000 check was a gift; that he cashed the check the following day, and denied generally plaintiffs' charge of undue influence.
Plaintiffs contend that a donee of personal property has the burden of proving by clear, cogent and convincing evidence every element of a gift (cases, next paragraph), while stating that a plaintiff who seeks to set aside an executed, acknowledged and delivered voluntary deed has the burden of proving the deed is void, citing Stallcup v. Williamson, 361 Mo. 440, 235 S.W.2d 318, 321[2], cases there cited, and Reaves v. Pierce, Mo., 26 S.W.2d 611, 617[7,8]. Consult Burke v. Adams, 80 Mo. 504, 511(III), 50 Am.Rep. 510; 26 C.J.S., Deeds, § 187, page 598; 16 Am.Jur. 513, §§ 135-137, 384, 385, 389.
Under the pleadings defendant affirmed and plaintiffs denied the gift of the $40,000 to defendant. Defendant's plea is in confession and avoidance. He judicially admits the $40,000 originally was the property of Jerry Wolf, making out a prima facie case against himself when he claims ownership thereof as a gift from Jerry Wolf. Defendant had the affirmative and the burden on the issue of a gift. Tygard v. Falor, 163 Mo. 234, 245(5), 63 S.W. 672, 675(5); Spencer v. Barlow, 319 Mo. 835, 5 S.W.2d 28, 32(III, IV); State ex rel. Smith v. Bland, 353 Mo. 1073, 186 S.W.2d 443, 444[2-4]; Dorrell v. Sparks, 142 Mo.App. 460, 464, 127 S.W. 103, 105.
The cases of Hornsey v. De Voto, 223 Mo.App. 340, 16 S.W.2d 630, 633, and Chandler v. Hedrick, 187 Mo.App. 664, 173 S.W. 93, are distinguishable. The Hornsey case was remanded for retrial, the issue of a gift being for the jury although the evidence preponderated in favor of the donee. In the Chandler case the defendant claimed the property as compensation for services and not as a gift.
The essentials of a valid gift of personal property are a present intention to make a gift on the part of the donor, a delivery of the property by the donor to the donee, and an acceptance by the donee, whose ownership takes effect immediately and absolutely. Trautz v. Lemp, 329 Mo. 580, 46 S.W.2d 135, 144; 38 C.J.S., Gifts, §§ 10, 15, page 786; 24 Am.Jur. 738, §§ 20-22. Plaintiffs do not question that a delivery sufficient to complete an inter vivos gift of a check occurs when the donee cashes the check. Pennell v. Ennis, 126 Mo.App. 355, 359, 103 S.W. 147, 148; Perry v. First Nat. Bank, 228 Mo.App. 486, 68 S.W.2d 927, 928. They say it was for the jury in the instant case to find whether the delivery was with the intent to give; that personal property or a check may be delivered conditionally or for a special purpose only, as with an intent to create a loan, a trust, a bailment or to enable an agent to perform the purpose of his agency. An intention to give does not constitute a gift without an unconditioned and complete delivery. Neither does a delivery constitute a gift unless made with an intention to give.
Jerry Wolf did not say what the $40,000 check was for. He stated that "Ed and Mamma" would pay the income tax. This indicated he did not expect to pay the income tax and that his wife would be interested in its payment. A jury could find from the evidence that the net income from the real estate was not sufficient for Mrs. Wolf's support and maintenance. Defendant did not express surprise or ask what the check was for. He must have known. He manifested no appreciation of a gift of $40,000. He said nothing. He did not disclose to his *925 sisters that he had received a gift. His letter to a sister stated "quite a bit" was required to take care of inheritance taxes on what the mother received from the father's estate, whereas the record indicates that she did not receive anything subject to such a tax. The inheritance and estate taxes on both estates appear to have been under $1,300, and the Federal tax resulted from the $40,000 check. Defendant must have known this. Defendant and Mrs. Wolf applied her $3,400 widow's allowance to the payment of Jerry Wolf's income taxes. The above and other facts were for the jury's consideration on the issue whether a gift was intended. Jerry Wolf's intent in issuing the check under the facts of record is for a jury to determine and is not to be solved as a matter of law. Defendant had the burden on this issue. Lewis v. Lewis, 354 Mo. 415, 189 S.W.2d 557, 560 [5-9, 12]; Roethemeier v. Veith, 334 Mo. 1030, 69 S. W.2d 930, 934[11]; Hall v. Knappenberger, 97 Mo. 509, 11 S.W. 239; In re Diehl's Estate, Mo.App., 239 S.W.2d 523, 526; Walker v. Travis, Mo.App., 125 S.W.2d 79, 80[1]; McCune v. Daniels, Mo.App., 225 S.W. 1020, 1022[6]; Schwalbert v. Konert, 230 Mo.App. 811, 76 S.W.2d 445, 449[1]; Foley v. Allen, 5 Cir., 170 F.2d 434, 437 [3, 4]; Fitzpatrick v. Graham, 2 Cir., 122 F. 401, 404; Wright v. Bragg, 7 Cir., 106 F. 25, 31; 38 C.J.S., Gifts, §§ 15, 69, pages 790, 891; 24 Am.Jur. 738, § 21, p. 798, §§ 131-134.
Undue influence in law is such overpersuasion, force, coercion, or deception as substitutes the will of another for that of a testator, grantor or donor. Hahn v. Brueseke, 348 Mo. 708, 155 S.W.2d 98, 106[8]; McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 706. It must be operative at the time to invalidate a transaction. Hahn v. Brueseke, supra; Wright v. Stevens, Mo., 246 S.W.2d 817, 821. In addition to the existence of a fiduciary relation, to raise a presumption of undue influence, there must exist evidence from which it can be inferred that the fiduciary-beneficiary "had been active in some way which caused or assisted in causing the execution of the" instrument. Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772, 777; Baker v. Spears, 357 Mo. 601, 210 S.W.2d 13, 17. Such activity may be proved by circumstantial evidence; but the circumstantial evidence to raise the presumption of undue influence must be substantial evidence permitting of the inference and may not rest on conjecture or be inferred from mere suspicion or an opportunity to influence. Baker v. Spears, supra; McCoy v. McCoy, supra; Shaw v. Butler, Mo., 78 S.W.2d 420, 428; Norris v. Bristow, 358 Mo. 1177, 219 S.W.2d 367, 369[4], 11 A.L.R.2d 725.
The rule that a confidential and fiduciary relation exists between partners with respect to partnership transactions, Schneider v. Schneider, 347 Mo. 102, 146 S.W.2d 584, 589[19]; 40 Am.Jur. 217, § 128; 68 C.J.S., Partnership, § 76, page 516, note 31, does not preclude such fiduciary relation extending to the personal affairs and property of a partner if trust and confidence born of the partnership relation be established to extend to personal transactions. "The origin of the confidence and the source of the influence are immaterial." 36 C.J.S., Fiduciary, page 745, note 59; Manahan v. Manahan, Mo., 52 S.W.2d 825, 828.
Plaintiffs contend that the cumulative effect of a number of circumstances amounting only to a suspicious circumstance when viewed separately, each being insufficient in itself to make a prima facie case and not directly connected with the others, may constitute substantial evidence of undue influence. Bohnsack v. Hanebrink, Mo., 240 S.W.2d 903, 907, 908; Look v. French, 346 Mo. 972, 144 S.W.2d 128, 131[2, 14]; Patton v. Shelton, 328 Mo. 631, 40 S.W.2d 706, 714[16]. They say that if the case is on the border line, and we so view the instant issue, the fact that the legacy or the grant was contrary to the expressed intent of the testator or grantor before or after the transaction and, a fortiori, his expressed intent at the time of the transaction a prima facie case is pieced out for the jury. They cite, among others, cases supra, this paragraph; Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842, 846; Holland v. Anderson, *926 Mo., 196 S.W.2d 175; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 68; Dimity v. Dimity, Mo., 62 S.W.2d 859; Manahan v. Manahan, Mo., 52 S.W.2d 825.
Plaintiffs stress the following facts of probative value on the issue of undue influence, conceding that any one of said facts in itself is not sufficient for the submission of said issue. That the fiduciary-beneficiary was present at the time. Clark v. Powell, supra; McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 707[22]. That, evidently considering fom Jerry Wolf's statements and acts he contemplated his early demise, a $40,000 gift, disinheriting his wife and daughters, was unnatural. Dimity v. Dimity, Mo., 62 S.W.2d 859, 863; Look v. French, 346 Mo. 972, 144 S.W.2d 128, 132[10]. That the donor was aged, ill and of declining mental vigor. In re Kaimann's Estate, 360 Mo. 544, 229 S.W.2d 527, 530; Bohnsack v. Hanebrink, Mo., 240 S.W.2d 903, 907[6]; Colquitt v. Lowe, Mo., 184 S.W.2d 420, 421[2, 6]; Morris v. Morris, Mo., 4 S.W.2d 459, 463. That Jerry Wolf executed his will at the time he executed the $40,000 check, and by his will and by statements and conduct prior and subsequent thereto evidenced his intent that his wife have his property. Canty v. Halpin, 294 Mo. 96, 242 S.W. 94, 96[5, 6]; Morris v. Morris, supra; Gobel v. Kitchen, 217 Mo.App. 354, 266 S.W. 992, 993; Mumford v. Mumford, Mo.App., 194 S.W. 898, 900. That defendant concealed the transaction and his claim of a gift. Dimity v. Dimity, supra; Manahan v. Manahan, Mo., 52 S.W.2d 825, 829.
The plaintiffs testified that their father was not mentally weak. One of the plaintiffs stated that on account of illness he was not as mentally alert as prior to becoming sick. Other witnesses for plaintiffs testified that his mental condition was all right and that he was positive and did what he wanted to do. Pat Corcoran, plaintiffs' witness, testified that Mr. Waxman was Jerry Wolf's lawyer. Defendant brought Mr. Waxman to the home on the occasion in question. Mr. Corcoran's testimony was to the effect that Jerry Wolf was the directing head in the issuance of the check, and, although it was written as Mr. Waxman suggested, the act was the act of Jerry Wolf and neither defendant nor Mr. Waxman dominated and controlled Jerry Wolf's mind so that the check represented defendant's and not Jerry Wolf's wishes. We conclude the record does not disclose the weakened mental faculties, the close fiduciary relation, or the fiduciary's activity connected with the transaction found in plaintiffs' cases. The issuance of the check for whatever purpose Jerry Wolf had in mind appears from evidence of plaintiffs' witnesses to have been the expressed desire of Jerry Wolf and his voluntary act. Opportunity for the exercise of undue influence existed, but the record does not inferentially establish that it was exercised. Plaintiffs have not established error on this issue. See, among others, Larkin v. Larkin, Mo., 119 S.W.2d 351, 356-358; Knadler v. Stelzer, 323 Mo. 499, 19 S.W.2d 1054, 1059-1060; Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 143-145; State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S.W.2d 360, 362-364; McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 705-708; Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449, 452-453; Baker v. Spears, 357 Mo. 601, 210 S. W.2d 13, 17, 18.
The judgment is reversed and the cause remanded for trial on the issue of a gift.
WESTHUES and BARRETT, CC., concur.
PER CURIAM.
The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.
All concur.