**In the Matter of the ESTATE of Irvin WALLER, Deceased.**

**No. 10492.**

Missouri Court of Appeals, Springfield District.

Nov. 22, 1977.

James Edward Reeves, Ward & Reeves, Caruthersville, Veryl L. Riddle, G. William Weier, Bryan, Cave, McPheeters & McRoberts, St. Louis, L. Joe Scott, Poplar Bluff, for appellant Helen Waller.

William O. Welman, Welman, Beaton & Sharp, Kennett, for respondent Gordon F. Waller.

Before TITUS, P. J., and FLANIGAN and HOGAN, JJ.

FLANIGAN, Judge.

The two former co-executors of the will of Irvin Waller, deceased, are at war with each other on the issue of whether the estate should be reopened pursuant to § 473.147,[1] which provides for the granting of "letters of administration of the goods remaining unadministered."

On October 30, 1975, Helen Waller, ("Helen"), sought to invoke § 473.147 by filing, in the Probate Court of Dunklin County, an "application for an order reopening the estate and for letters of administration de

---

1. Unless otherwise indicated, all references to rules are to Missouri Rules of Civil Procedure V.A.M.R., and all references to statutes are to RSMo 1969 V.A.M.S.

bonis non." Helen's former co-executor, Gordon F. (Jack) Waller, ("Jack"), filed an objection to the application. After hearing evidence from both sides, the probate court denied the application. Helen appealed to the circuit court and that tribunal also denied the application. Helen appeals.

Irvin Waller died on January 28, 1970. Helen, his second wife, is his widow. Jack is the only child of Irvin's first marriage. In February 1970, Irvin's will was admitted to probate and letters testamentary were issued to Helen and Jack. Beneficiaries named in the will were Helen, Jack, Nancy Beall (daughter of Helen and Irvin), Jackie Chambers and Gordon I. Waller. The latter two are grandchildren of Irvin and children of Jack. In December 1971, Helen and Jack filed their final settlement. The probate court approved it and on March 3, 1972, entered an order discharging the executors.

The briefs of the parties advance conflicting views on whether the reopening of the estate was barred by the 5-year limitation contained in § 473.070. Helen argues that the statute applies only to the opening of original administrations and does not apply to administrations de bonis non. Jack argues that the statute bars Helen's application.

The material portion of § 473.147 is:

"2. If, after final settlement of an estate is had and the executor or administrator has been discharged, unadministered assets of the estate are discovered, letters of administration of the goods remaining unadministered, *if there are unpaid allowed claims or if other good cause is shown, may be granted . . .*"

Whether § 473.070 bars the instant proceeding need not be decided for the reason that this court holds that the trial court properly could have found that there was no showing of "good cause" for the granting of letters of administration d/b/n.

Helen's verified application stated that the "unadministered assets of the estate" consisted of the following: (a) 10 shares of stock in the State Bank of Bernie, and (b) approximately $26,000 "in the form of currency or bonds." The application further stated that those assets were shown on an amended U.S. estate tax return which Helen filed on September 26, 1975. A copy of the latter return was attached to the application.

When the cause was appealed from the probate court to the circuit court, the latter became "possessed of the cause" and was under the duty to "proceed to hear, try and determine the same anew, without regard to any error, defect or other imperfection in the proceedings of the probate court." § 472.250; Maus, Mo.Prac., Prob.Law and Prac., Vol. 3, § 580, p. 551.

With an exception not applicable here, Rule 41.01(b) provides: "Civil actions originating in the . . . probate courts but which are pending in the Supreme Court, Court of Appeals, circuit courts, or courts of common pleas, shall be governed by Rules 41 through 101."

In the circuit court, where the case was tried without a jury, the record consisted of the following: The file of the probate court in the estate of Irvin Waller, deceased, the amended U.S. estate tax return and the testimony of Helen and Jack.

Neither Helen nor Jack invoked Rule 73.-01(1)(b), which permits a party to request a statement of the grounds for the court's decision and its findings on specified controverted fact issues. Because the circuit court made no such findings, that rule requires that "all fact issues . . . shall be considered as having been found in accordance with the result reached."

Helen's application did not allege that there were "unpaid allowed claims." Jack's brief, which he filed as respondent in this court, states that there are no "unpaid allowed claims"[2] and that this is "undisput-

---

**2.** § 472.010, as originally enacted in 1955, defined the word "claims" to include "and all estate and inheritance taxes." In 1957 the latter language was deleted. Even if, as appears

to be the case, some taxes remain unpaid in this estate, they have not been "allowed" and thus, at least in this instance, are not "unpaid allowed claims." "An executor or administra-

ed." Helen's reply brief does not attack that statement. Helen's position, on this appeal, is that she has shown "other good cause," § 473.147, for the granting of the letters of administration d/b/n.

The record strongly suggests[3] that the instant proceeding was motivated by Helen's desire to establish that 10 shares of stock in the State Bank of Bernie, now in the possession of Jack, were owned by the decedent at the time of his death and should have been included in his estate. If so included, Helen would take the 10 shares under the will.

Helen's theory that the 10 shares in question were owned by the testator is based on the factual assumption that the certificates representing those shares, although issued to Jack, had been endorsed in blank by Jack and were in the testator's safety deposit box at the time of the latter's death. However, Jack testified that the certificates were kept in Jack's own box and were not in the testator's box at any time. Helen offered no substantial evidence to the contrary, although she was present, with Jack, when the testator's box was initially opened after his death. Accordingly the trial court properly could have found that Helen's claim with respect to the 10 shares was unsupported by the evidence.

Jack and Helen were the only two witnesses who testified and each called the other. In some respects their versions coincide and in others they differ. Under any view of the evidence, each failed to perform duties statutorily imposed upon an executor. Those duties include the inventorying of "all of the property of the decedent" and "all property possessed but not owned by the decedent," § 473.233, and the annexing of an affidavit to the inventory, "stating that it is a full inventory and description of all of the property of the decedent which has come into the possession or knowledge of the executor or administrator and of the property in the possession of the decedent at his death, as far as they know." § 473.237. During the original administration Jack and Helen verified and filed the original inventory. Nine months later they verified and filed an amended inventory. Neither document made mention of the instant "unadministered assets."

At the time of decedent's death Jack was president of the Bank of Malden. The day after the testator's funeral, testator's safety deposit box, located in the Malden Bank, was opened after banking hours by Helen and Jack with no other person present. Jack had the bank's key to the box and Helen brought the other key to the bank.

Jack admitted that when the box was opened he "had not received a consent or waiver from the attorney general or the Department of Revenue," and that he was "aware of the fact that such consents and waivers were required by state law prior to opening a lock box of a decedent."[4]

---

tor shall pay all taxes due the United States, the State of Missouri . . . without any claim therefor being presented to the court for allowance. . . . " Maus, Mo.Prac., Prob.Law and Prac., Vol. 4, § 933, p. 217.

The probate court made a finding that there were no unpaid "allowed claims."

3. Jack's brief asserts that the "reason behind all of this litigation" is the 10 shares of stock. Helen's reply brief says, "The 10 shares of Bernie stock have substantially more significance than meets the eye. If [Helen] is declared the rightful owner of those shares, as she should be, she would then own ½ of the outstanding stock and thus be able to have an equal voice in bank matters. Without those shares, her remaining interest in the bank is worth substantially less because of the control factor."

4. In 1970 § 145.210 read in part:

"2. No . . . bank or other . . . person or persons having in possession or under control securities, deposits, or other assets belonging to or standing in the name of a decedent . . . shall deliver or transfer the same to the executor, administrator, or legal representative of the decedent . . . or upon their order or request unless notice of the time and place of the intended delivery or transfer be served upon the director of revenue and attorney general at least 10 days prior to the delivery or transfer." The statute also conditions delivery upon retention of a sufficient amount "to pay and tax or interest which may thereafter be assessed on account of the delivery or transfer" unless the director of revenue and the attorney general give written consent thereto. Violators of the statute are subject to

Among the contents of the box were 230 shares of stock in the Bernie Bank issued to testator and inventoried in the estate. The box also contained 10 shares in the Bernie Bank issued to Helen. Helen's shares were included in the original inventory but should not have been and the mistake was corrected by an amended inventory filed by Helen and Jack in December 1970.[5]

The box contained 4 sealed envelopes, each bearing a name. There was an envelope apiece for Jackie Chambers, Gordon I. Waller, Tracy Waller, and Helen. Helen's envelope bore the legend, "This is for Helen to pay inheritance tax." It contained $1,000 in cash and "the listing of $115,000 in stocks and bonds from the National Stockyards." Helen admitted that she took the $1,000 out of her envelope "and it was not reported." The other envelopes were not opened at the bank.

The will was in the box and Jack and Helen looked at it. The envelopes were removed from the box and taken by Helen and Jack to Helen's home where a birthday dinner was held for Helen. There Jackie, Gordon and Tracy were given their respective envelopes.

The record is unclear with regard to the contents of the envelopes of Gordon, Jackie and Tracy. Helen's testimony was that Gordon's envelope contained $10,000, Jackie's contained $10,000, Tracy's contained $5,000 and Helen's contained $1,000. According to Helen that is how she arrived at the $26,000 figure mentioned in the application. She stated, however, that she did not know what the envelopes of the three other people contained. "I just know what the children told me." [6]

The will gave to Jackie "all the bank stock I own in the National Bank of Caruthersville or $10,000 in cash" and gave to Gordon "the sum of $10,000." In the original administration, Jackie received the Caruthersville bank stock but no money. Gordon received nothing and signed a "release as to a lapsed bequest." The decree of distribution recited that Gordon's bequest lapsed "due to insufficient assets in residue of estate for payment thereof."

Jack's testimony in essence was that he did not know how much money the envelopes contained. In the probate court Jack testified that he thought Jackie received "around $10,000 or $20,000" and he thought Gordon received a similar amount. Jack thought that Tracy received "a $10,000 bond." Jack had made some "notations," which he had not brought to the courtroom, concerning the contents. Although the circuit court trial was held two and one-half months later, the record does not show any effort by Helen to produce those notations or to obtain any more specific testimony from Jack.

It was Jack's testimony that "none of this cash that I have described that was delivered to my children, my grandchild and Helen" was inventoried in the estate and that none of it was included in the inheritance tax report or reported in the original federal estate tax return which he and Helen had signed.

Jack admitted that when he signed the federal estate tax return he knew that the cash had been omitted from the return. When asked if he knew that he was violating the "Internal Revenue Laws" in doing so, Jack gave the lame and unresponsive answer, "It was my assumption that probably my father left that money there for the family and their use. I am sure he had paid taxes on it."

The amended estate tax return was filed by Helen three and one-half years after the

liability for the payment of "the tax and interest due" and a penalty.

5. Helen's brief relies upon the amended inventory as supporting her assertion that the 10 shares of Bernie stock *issued to Jack* were in testator's deposit box. Helen gave no such testimony and Jack's testimony, as indicated, was to the contrary.

6. The record does not contain any testimony, deposition or direct, of Jackie, Gordon or Tracy, nor any explanation for that lack. Helen's instant application alleged that Jackie and Gordon resided at Malden, Missouri. It makes no mention of Tracy, who was not named as a beneficiary in the will.

estate was closed. Helen said she filed it "voluntarily" and that she had not been "audited." It contained a declaration by Helen "under penalties of perjury" that it had been examined by her and was, "to the best of my knowledge and belief, true, correct and complete." It contained a recital that Helen had made a careful and diligent search for property of every kind left by the decedent.

The only new assets shown on the amended return which were not shown on the original were the 10 shares and the $26,000 mentioned in Helen's application. The return called for information concerning whether the decedent had a safety deposit box and, if so, whether any of the contents of the box were omitted and a full explanation thereof. Helen left these inquiries unanswered. The original return contains similar inquiries, similarly unanswered. The amended return, as did the original, took credit, as deductions, for $6,000 in executor's commissions and $6,000 in attorney's fees. The probate records show, however, that Helen and Jack waived their executor's commissions and that the total attorney fee paid was $3,500.

All the information which Helen included in the amended return was possessed by her at the time the original return was filed during the course of the original administration. The amended return itself contains inaccuracies of which Helen had to be aware.

In support of her contention of "good cause" for the sustention of her application, Helen makes the following points:

1. "Conceding a dispute as to the [10] shares," $26,000 of assets of the testator were not inventoried in his estate.

2. Helen advanced $50,172.01 to the estate to pay the federal estate tax shown on the original return, and Helen paid $4,167.60 in connection with the filing of the amended return. The will provided: "all taxes to be paid from my estate."

3. After the distribution of bank stock and payment of fees and expenses, the distributed estate was $386.41.

4. Gordon I. Waller released his claim to a $10,000 bequest under the will.

■ With respect to [1], an examination of § 473.147(2) discloses that the existence of unadministered assets is not alone sufficient to trigger the operation of the statute. Letters may be granted if, in addition to the discovery [7] of such assets, there are unpaid allowed claims or if other good cause is shown. Helen's statement that $26,000 in assets were not inventoried may well be accurate, but in making that statement Helen confesses her own dereliction.

With respect to [2], Helen does not claim that any portion of the federal estate tax remains to be paid or that the failure of her application would prevent its collection by the government. Her position seems to be that some of the other beneficiaries should participate in the tax burden. Whether or not the appointment of a personal representative would be a prerequisite to such litigation,[8] a matter on which Helen cites no authority, she fails to show that this problem could not have been resolved during the course of the original administration.

With respect to [3], the statement made is factually correct but Helen fails to demonstrate why that fact constitutes "other good cause."

With respect to [4], the evidence permits a finding that Gordon I. Waller has in fact received his bequest, although such was done by by-passing the probate court, with Helen's knowledge and participation. There is no showing that this legatee's financial position would be improved if the

---

7. Jack argues that the assets in question were not discovered "after final settlement of an estate is had and the executor or administrator has been discharged," § 473.147(2), because he and Helen knew about them before the original estate was closed. Citing *In re Nitti's Estate*, 22 Ill.App.2d 300, 160 N.E.2d 706, 708[3] (1959), Helen argues that the discovery, within the meaning of the statute, is done by the probate court and not by the applicant or another person. In view of the disposition of this appeal, that issue need not be resolved.

8. Cf. *Michaelson v. Wolf*, 364 Mo. 356, 261 S.W.2d 918, 923 (1953).

estate were reopened and he has not requested reopening.

It may be that taxes other than federal estate taxes [9] remain unpaid, but Helen makes no mention of that nor does she claim that her lack of success below would preclude their collection.

" 'Good cause' depends upon the circumstances of the individual case, and a finding of its existence lies largely in the discretion of the officer or court to which the decision is committed." *Wilson v. Morris,* 369 S.W.2d 402, 407[7] (Mo.1963).

"Even though there are newly discovered assets of an estate the appointment of an administrator of the goods unadministered is not required unless there are unpaid allowed claims against the estate, or other good cause is shown. What may constitute other good cause is not defined and has not been fully developed by the cases. The phrase would appear to include situations where it was uncertain who, as heirs or distributees, is entitled to receive the newly discovered assets. If there are no debts and it is clear who is entitled to the newly discovered assets, and all parties interested therein can be brought before the court, it has been held proper for those distributees or heirs to maintain an action to collect or reduce to their possession the newly discovered assets of the estate without the appointment of an administrator of the goods unadministered." Maus, Mo.Prac., Prob.Law & Prac., Vol. 4, § 1523, p. 644.

In this proceeding Helen seeks issuance of letters of administration d/b/n to accomplish purposes which, so far as the record reflects, would redound solely to her own benefit. They are purposes which, had she not neglected her duties during the original administration, could have been accomplished during the course of it. The relief sought is based upon information which was within her knowledge prior to and during the original administration. The latter, improperly conducted by her and her co-executor, had been closed for several years before her personal motives precipitated the instant proceeding. Even her belated efforts to comply with federal estate tax requirements are inadequate. The trial court was entitled to reach the conclusion that there was no showing of "other good cause," § 473.147(2), and its decision not to grant the application should not be disturbed. Rule 73.01; *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

The judgment is affirmed.

All concur.

**9.** During his appellate argument Helen's counsel was asked if the assets mentioned in the application had been the subject of an amended Missouri inheritance tax report. His answer was that his own computations indicated no tax was due. Accordingly Helen's claim of good cause does not include an assertion by her that additional inheritance tax is due.